IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTY HUDSON, | ) | |
| Plaintiff, | ) ) ) | CASE NO: 1:23-cv-2182 |
| | ) ) | Judge Dan Aaron Polster |
| v. | ) ) | |
| THE CLEVELAND CLINIC FOUNDATION, | ) ) ) ) | **OPINION AND ORDER** |
| Defendant. | ) ) | |

Before the Court is Defendant Cleveland Clinic Foundation's ("CCF" or "the Clinic") Motion for Summary Judgment on Contractual Limitation of Liability. ECF 19. On March 12, 2025, Plaintiff Christy Hudson filed her opposition brief. ECF 37. CCF filed its reply brief on April 7, 2024. ECF 39. For the reasons explained below, the Court **GRANTS** CCF's motion for summary judgment.

I. BACKGROUND

A. Factual Background

CCF is a nonprofit, multispecialty academic medical center the employs over 75,000 individuals at its various locations in Northeast Ohio and around the world. ECF 19 at 1-2. The Clinic's Pathology department houses a section on Transfusion Medicine, which in turn houses the Blood Bank. *Id.* at 2. "The Blood Bank is responsible for testing compatibility of blood products and providing those blood products for patient transfusions, surgeries, and other procedures." *Id.* It operates 24/7 and is consistently one of the largest and busiest blood banks in

1

the country. *Id.* At the same time, it is also chronically understaffed. *Id.*; *see also* ECF 37 at 1.

Hudson began working at the Clinic's blood bank in 2004 as an hourly Blood Bank Bench Technologist. ECF 37 at 1. She worked in this role for ten years before being promoted to a laboratory supervisor position. *Id.*; *see also* ECF 19 at 2. Her responsibilities were mainly administrative, including personnel management, overseeing training, and disciplinary actions. Hourly employees working at the Blood Bank reported to Hudson, including bench technologists, team leads, and coordinators. ECF 19 at 3; ECF 37 at 1-2. Hudson and another laboratory supervisor, Celeste Dean-El, both reported to Patrice Walton, the Laboratory Manager. All three women are Black. ECF 19 at 2-3.

In 2018, Kimberly Grider, who is White, was hired as Administrator of the Clinical Pathology department, making her Walton's direct supervisor. *Id.* at 3; ECF 37 at 2. Upon her appointment, Grider was asked specifically to focus improvement efforts on the Blood Bank and another laboratory in the department. There were two main sources of feedback during the relevant time period in this case. The first is a biannual survey of employees, the Press Ganey Survey, which was used to measure employee engagement as a team and their opinion of team leadership. Individuals who receive low scores on the survey are required to develop an action plan for addressing those low scores, including taking leadership classes. ECF 37 at 3. The other source, developed in response to negative feedback from caregivers on the Press Ganey Survey, was a series of "town hall" style meetings organized by Human Resources in April 2020. Combined, these revealed that caregivers had extensive complaints about the adverse effects of constantly being short-staffed. *Id.* at 3-4. Several caregivers also raised concerns about the lack of advance notice of shift schedules, which fell under Hudson's responsibilities. ECF 19 at 4. Grider, Walton, and several other leaders were also all identified as needing additional training and support.

At the same time, the Blood Bank was preparing to implement a new information software program called SafeTrace. The project has been in the works for a number of years and had faced a series of starts and stops before Grider was onboarded at the Clinic. ECF 37 at 4. The transition to SafeTrace was intensive, requiring all staff at the Blood Bank to undergo on-site training and members of leadership to take on new responsibilities not originally within their job descriptions. *Id.*; *see also* ECF 19 at 7.

In April 2021, Dean-El resigned from her position as a laboratory supervisor at the Blood Bank. In her exit interview, Dean-El raised concerns about Hudson and Walton's leadership. In June 2021, Walton retired from the Blood Bank. With two of the three leadership positions in the Blood Bank now empty, Grider stepped in to serve as Hudson's interim manager. Additionally, Hudson took on at least some duties that had been assigned to Deal-El, on top of her own duties. ECF 37 at 6-7. This temporary arrangement lasted until Megan Hearns, a White woman, was hired as the Laboratory Manager. ECF 19 at 5-6.

In October 2021, Hudson took pre-planned PTO, but ended up contracting COVID-19 while she was out, prolonging her time away from work. ECF 37 at 7. This extended leave was approved under the FMLA, as was the subsequent intermittent FMLA leave Hudson was granted over the next several months due to COVID-19. *Id.* at 8; *see also* ECF 19 at 7. While on leave, Hearns would contact Hudson intermittently for assistance, but generally experienced no issues with getting her FMLA leave approved. ECF 38 at 8; ECF 19 at 7.

In early 2022, the Blood Bank was preparing to finally implement the SafeTrace program. ECF 19 at 7. However, as of January 2022, with less than a month before the program was set to launch, Hudson had still not completed the required trainings. *Id.* Hudson requested that she be able to complete this training remotely because she was unable to secure childcare. *Id.* Hearns and

3

Grider had a meeting with Hudson, where Grider denied the request to participate remotely. *Id.*; *see also* ECF 37 at 8. The rest of the meeting was spent discussing other performance issues with Hudson, including attendance and communication issues. Following this meeting, Hudson reached out to Human Resources with concerns about the meeting and asked that a follow-up be scheduled to discuss Grider and Hearns' concerns in greater depth. ECF 37 at 9; ECF 19 at 8. Hearns attended this meeting, though Grider did not. At no time in this meeting did Hudson express that she believed these conversations were happening because of her race or due to her FMLA leave. ECF 19 at 8.

Two weeks later, Hearns conducted Hudson's 2021 annual performance review. Prior to this meeting, Hearns, who had only been Hudson's manager for four months, reached out to Grider and other colleagues of Hudson to get a fuller understanding of Hudson's performance over the entire year. *Id.* at 8-9. Hudson received a rating of "commendable," which is the second lowest rating available. Hudson agreed with Hearns that there was room for improvement in many areas, and the two met regularly over the next several months to provide informal feedback on Hudson's performance. *Id.* at 9.

On June 10, 2022, Hearns issued Hudson's first disciplinary action – Document Counseling – in response to communication, time management, and timely completion of tasks concerns. *Id.* Hudson reached out again to Human Resources to express concerns about this meeting, acknowledging at least some of the concerns as accurate, but pushing back on others as being inaccurate or misleading. *Id.*; ECF 37 at 10-11. As with her previous report to Human Resources, Hudson again did not raise the notion that the discipline was connect to her race or FMLA leave. ECF 19 at 10.

The summer of 2022 saw two third-party inspections of the Blood Bank, each of which

4

documented deficiencies related to Hudson's responsibilities. *Id.* The first inspection was by the American Association of Blood Banks ("AABB") in June 2022. The AABB did not revoke the Blood Bank's accreditation, but issued three nonconformances. Two of these nonconformances, incomplete competencies and failure to follow and update standard operating procedures, were directly linked to Hudson's job responsibilities. *Id.* The second inspection was by the Food and Drug Administration ("FDA") in July 2022. The FDA inspector found multiple deficiencies that had to be corrected, at least some of which were related to Hudson's job responsibilities. ECF 37 at 11-12; ECF 19 at 11. It was one of the worst inspections the Blood Bank had seen, and led to the Blood Bank facing increased inspections and scrutiny. ECF 19 at 11. Hudson admitted to some of the adverse findings by the FDA inspector. ECF 37 at 12.

As a result of these two inspections, Grider and Hearns continued to harbor concerns about Hudson's performance. ECF 19 at 12. On September 26, 2022, Hearns issued Hudson a written warning and placed her on a sixty-day performance improvement plan ("PIP"). *Id.*; *see also* ECF 37 at 13. Many of the performance issues documented in the written warning and PIP were directly connected to the AABB and FDA inspections, though others were continued holdovers from previous performance reviews. ECF 19 at 12.

At around the same time, the Blood Bank finally hired a second laboratory supervisor. Patti Brenner, a White woman, was hired to fill the gap Dean-El had left when she resigned. *Id.* Hudson was responsible for training Brenner, while also completing her normal responsibilities. ECF 37 at 13.

Hudson and Hearns met again at the end of the first thirty days of the PIP. At that meeting, Hudson admitted to a variety of performance issues that were identified as part of the PIP. As Hudson had not made any progress on these items, Hearns issued a final written warning and

5

continued the PIP for the remaining thirty days. ECF 19 at 13-14. By December 2022, at the conclusion of the sixty-day PIP, Hudson had failed to satisfy any of the objectives identified in the PIP. As a result, Hearns terminated Hudson's employment on December 9, 2022. *Id.* at 14. Hudson did not avail herself of CCF's internal Right of Review procedure, which would have allowed her to appeal her written warning, final written warning, and termination. *Id.*

### B. Procedural Background

Following receipt of a Notice of Right to Sue from the Ohio Civil Rights Commission, Hudson filed her complaint on November 8, 2023, alleging violations of her rights under Title VII of the Federal Civil Rights Act, the Ohio Civil Rights Act, OHIO REV. CODE § 4112 *et seq.*, and the Family Medical Leave Act ("FMLA"). ECF 1 ¶¶ 1, 64. CCF filed its response on January 8, 2024. ECF 4. Discovery continued over the next year, and on February 10, 2025, CCF filed its motion for summary judgment. ECF 19. Hudson filed her brief in opposition to the motion on March 12, 2025, ECF 37, and CCF filed its reply in support of its motion on April 7, 2025, ECF 39. The matter is now ripe for ruling.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory and unsupported allegations, rooted in speculation are insufficient to create a genuine dispute of material fact for trial." *Gunn v. Senior Servs of N. Ky.*, 632 F. App'x 839, 847 (6th Cir. 2015) (citing *Bell v. Ohio St. Univ.*, 351 F.3d 240, 253 (6th Cir. 2003)); *see also* Fed. R. Civ. P. 56 (e)(2). As the Supreme Court has explained, "[the

6

non-moving party] must do more than simply show that there is metaphysical doubt as to the material facts." *Matsushita Elec., Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether genuine issues of material fact exist, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson,* 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed R. Civ. P. 56(c), (e).

### III. ANALYSIS

When a plaintiff alleges unlawful employment discrimination or retaliation, they bear the initial burden of either presenting direct evidence of the unlawful actions or establishing unlawful intent indirectly through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See generally Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012). A case with direct evidence of discrimination or retaliation is rare, and Hudson does not allege such facts in this case. As such, she is required to first make a *prima facie* case for discrimination or retaliation by a preponderance of the evidence, before the burden then shifts to the Clinic to show a legitimate, nondiscriminatory, nonretaliatory reason for terminating

7

Hudson's employment. *McDonnell Douglas*, 411 U.S. at 802. If CCF satisfies its reciprocal burden, the burden then shifts back to Hudson to prove that the state reason was pretextual. *Romans*, 668 F.3d at 838.

When examining employment discrimination claims pursued under state law, Ohio courts look to federal discrimination case law as instructive. *See, e.g.*, *Coryell v. Bank One Trust Co. N.A.*, 803 N.E.2d 781, 784-85 (Ohio 2004). As such, this Court will analyze the Title VII and Ohio Civil Rights Act racial discrimination claims simultaneously. *Cf. Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000) (citations omitted) (noting that the Ohio Supreme Court has held that the elements of Ohio Revised Code Section 4112.02(A) are the same as those under Title VII); *see also Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 163 (6th Cir. 2004) ("[F]ederal case law applying Title VII is generally applicable to cases involving 4112 of the Ohio Civil Rights Act.").

### A. RACIAL DISCRIMINATION CLAIM

To establish a *prima facie* case of race discrimination under Title VII and Ohio law, Hudson must establish four factors: (1) membership in a protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by, or treated differently than, someone outside the protected class. *See McDonnell Douglas*, 411 U.S. at 802. There is no dispute that Hudson, an African American, is a member of a protected class. There is similarly no dispute that she suffered an adverse action, since she was ultimately terminated. Accordingly, the Court turns to the remaining elements of the *prima facie* case.

CCF argues that Hudson was not qualified for her role as laboratory supervisor "because she failed to perform her job at a satisfactory level." ECF 19 at 15. However, Hudson, correctly, points out that, at the *prima facie* stage, it is sufficient for the plaintiff to establish that she has met

8

the objective standards for her role. ECF 37 at 18-19. In an *en banc* opinion, the Sixth Circuit has held that "a court should focus on a plaintiff's objective qualifications to determine whether [ ] she was qualified for the relevant job" rather than focus on her performance." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc); *see also Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 587-88 (6th Cir. 2002) ("Under the *McDonnell Douglas* test, concerns about [a plaintiff's] performance are more appropriately raised as part of the second and third steps ...") (internal quotations omitted). This analysis "should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler*, 317 F.3d at 576. Hudson asserts that she met the on-paper qualifications for her role, ECF 37 at 19-20, and the Clinic does not dispute this in its reply brief. As such, Hudson has demonstrated her objective qualifications for her role at the Blood Bank and has satisfied this element of her *prima facie* case.

Looking at the fourth element, Hudson must show that a White employee (who was similarly situated) must have been treated more favorably than her. Specifically, she must show that

> to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Johnson v. Ohio Dept. of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) ("Although other factors may also be relevant depending on the facts of each case . . . the *Mitchell* factors are generally relevant."). While the White employee need not be exactly identical to Hudson, "differences in job title and

9

responsibilities, experience, and disciplinary history" can establish that employees are not similarly situated. *Campbell v. Hamilton Cty.*, 23 F. App'x 318, 325 (6th Cir. 2001).

Hudson mainly focuses on Brenner as the comparable supervisor that was treated more favorably. She alleges that Grider and Hearns were more lenient with Brenner's deficiencies, even though Hudson and Brenner were both, at relevant times, working as the sole laboratory supervisor for extended periods of time. Hudson also points to an "inconsistent" rating on Brenner's 2023 performance review, and low scores for Brenner in the 2023 Press Ganey Survey. Despite this, Brenner had not been disciplined or been placed on a PIP. ECF 37 at 21-22. However, there are many factors that work against the notion that Hudson and Brenner are "similarly situated." As a preliminary matter, Brenner had only been working as a laboratory supervisor for less than three months at the time Hudson was terminated. This inherently makes it difficult to say that, at the time of Hudson's termination, Brenner was similarly situated. But beyond that, Brenner has also not accumulated the same lengthy list of performance deficiencies noted on Hudson's PIP; namely, Brenner has not "directly contributed to nonconformances issued during an AABB accreditation inspection," nor has she "directly contributed to the worst FDA inspection in 36 years, involving multiple deficiencies" or "accumulated the same laundry list of performance deficiencies," such as "repeated failures to post schedules, address subordinates' attendance/behavioral issues, investigate and complete TMIMs, etc." ECF 39 at 6. Even when Hudson can identify facially identical deficiencies, such as timely posting schedules, there are still meaningful differences that make them impossible to compare. *Id.* at 6 n.1 (noting that Hudson would routinely delay posting schedules for multiple months, whereas "on the rare occasion Ms. Brenner has posted the schedule late, she has done so by one or two days"). That Hudson disagrees with CCF's decisions to discipline her or terminate her for her performance issues is not sufficient to satisfy this element.

10

*See Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.").

Hudson's general citation to "Demographics and Disparate Treatment" fares no better, as all of those identified, except for Brenner, worked not in the Blood Bank, but in completely different laboratories and under completely different supervisors. *See Myers v. United States Cellular Corp.*, 257 F. App'x 947, 953 (6th Cir. 2007) (coworker was not similarly situated to plaintiff because he had a different job title and authority level, did not have the same performance issues, and was not on a PIP); *Johnson*, 942 F.3d at 331-32 (plaintiff was not similarly situated to a coworker who reported to a different supervisor).

Hudson also argues that she was replaced by Victoria Mercier, who is White, and this is sufficient to satisfy the fourth element. While it is true that replacement is a way to establish this element, there are many facts that counsel against this conclusion. Chief among them is that Mercier was not hired until nearly one year after Hudson was terminated. *See* ECF 39 at 8 n.2 (noting that Mercier was not hired until nearly eleven months had passed). A substantial gap in time between the adverse employment action and the replacement being hired can "substantially weaken[] any inference of discrimination that might otherwise arise from a subsequent hire." *McDaniel v. Wal-Mart Stores, Inc.*, 94 F. Supp. 2d 878, 882 (N.D. Ohio 2000) (citation omitted) (six-month gap between the plaintiff's termination and replacement by an individual outside the plaintiff's protected class did not support a prima facie case of race discrimination); *see also Speck v. Agrex, Inc.*, 888 F. Supp. 2d 867, 879 (N.D. Ohio 2012) (five-month gap insufficient in national origin discrimination case). While the timing is not necessarily dispositive, when combined with the other facts that show that Hudson was not treated differently from similarly situated White employees, the Court must conclude that Hudson is unable to satisfy this element.

Even if Hudson had been able to satisfy that fourth element, though, and establish her *prima facie* case, CCF has provided more than ample evidence of a legitimate, nondiscriminatory basis for disciplining and ultimately terminating Hudson. As the Sixth Circuit has held, being qualified for a position is about more than just meeting the on-paper requirements; it requires the individual to continuously perform at a level "which [meets] his employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). During Hudson's tenure as a laboratory supervisor at the Blood Bank, multiple caregivers, supervisors, and even outside regulatory and accrediting agencies identified a wide variety of performance deficiencies. For example, other employees at the Blood Bank provided overwhelmingly negative feedback about Hudson's leadership skills through the Press Ganey Survey and the 2020 Town Halls. *See, e.g.*, ECF 27-1, 27-5, 27-6 (Pl Tr. 86:14-98:10, 108:25-111:16, Ex. 4, 5); ECF 23-4 (Justin Tr. Ex. 22). Dean-El also expressed concerns about Hudson's performance during her exit interview in 2021. ECF 23-8 (Justin Tr. Ex. 26). And as previously discussed, the AABB and FDA inspections in Summer 2022 both revealed significant deficiencies, many of which could be directly connected to Hudson's responsibilities. Perhaps most harmful to Hudson's case is that she, herself, admits to the deficiencies underlying the written warnings and PIP. *See, e.g.*, ECF 27-1 (Pl. Tr. 149:18-154:6, 209:8-15, 230:1-233:10, 237:18-239:5, 240:17-245:23); *see also Hale v. Vill. of Madison*, 493 F.Supp.2d 928, 940 (N.D. Ohio 2007) (adopting magistrate judge's report and recommendation that, when plaintiff admits to the employer's proffered reasons for termination and offers no other evidence besides personal belief, there cannot be pretext).

When faced with this lengthy list of performance deficiencies, Hudson is unable to produce any evidence beyond her personal feelings that her discipline and termination were motivated by her race. *See Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 83 (6th Cir. 2020) ("[M]ere conjecture

that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."); *Hartsel*, 87 F.3d 795, at 801 ("[B]ald assertions and conclusory statements fail to provide any factual support for [discriminatory] animus."). Just because Hudson may not have come under close scrutiny for her performance until Grider, and later Hearns, was hired does not mean that her performance was necessarily satisfactory or that racial animus motivated Grider and Hearns' actions. In fact, Hearns had multiple informal meetings with Hudson before issuing the written warning and putting Hudson on a PIP. *See* ECF 27-1 (Pl. Tr. 116:24-117:3); ECF 31-1 (Hearns Tr. 99:3-8 (stating there were weekly leadership meetings)). The evidence is clear that Hudson had ample warning that there were serious concerns about her performance, and at no point did she raise concerns that they were improperly motivated by her race. In sum, Hudson cannot show that CCF's reasons for discipline and termination were pretextual.

### B. FMLA RETALIATION CLAIM

To establish a *prima facie* case of FMLA retaliation, Hudson must establish: (1) she engaged in activity protected by the FMLA; (2) CCF knew that she was exercising her rights under the FMLA; (3) CCF took an adverse employment action against her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *See Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). As to the fourth element, the causation factor, Hudson must show that but for her taking FMLA leave, she would not have been disciplined or terminated. *Sharp v. Profitt*, 674 F.App'x 440, 451 (6th Cir. 2016). An FMLA retaliation claim, like racial discrimination, may be proven using direct or indirect evidence. *See, e.g., Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

Hudson primarily makes her argument for this claim using direct evidence – namely, that

13

Grider explicitly included Hudson's FMLA-covered leave when criticizing Hudson's attendance record. ECF 37 at 28. However, Hudson must do more than merely identify that FMLA-protected leave was among the Clinic's concerns when it chose to discipline and ultimately terminate her. As Hudson herself acknowledges, she must show that CCF was not only predisposed to retaliate against her for this reason, but that it then specifically acted on that predisposition. ECF 37 at 27 (citing *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014)). This is a high bar because direct evidence does not require the factfinder to make any inferences whatsoever; the direct evidence must explicitly demonstrate the unlawful animus. *See, e.g.*, *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008) (plaintiff established direct evidence of FMLA retaliation when his supervisor told him that if he took FMLA leave, there would not be a job waiting for him when he returned). However, Hudson is unable to provide any evidence that rises to this level. In fact, she was able to take her FMLA leave and return to her job without interference. ECF 39 at 10.

Hudson attempts to bolster her assertion by citing to the timeline of events in reference to her FMLA leave. She notes that she took FMLA leave in October and November 2021, and was subsequently approved for FMLA intermittent leave thereafter. ECF 37 at 28. But it was only while she was on leave that Grider directed Hearns to begin documenting Hudson's performance issues, and these issues were not addressed with Hudson until January 2022, where she shortly thereafter complained about these concerns to Human Resources. *Id.* at 28-29. While this all may be true, neither of these in and of themselves constitutes an adverse employment action. In fact, Hudson did not receive her first disciplinary action until June 2022, roughly eight months after she took her FMLA leave and six months after Grider raised concerns about Hudson's attendance with her. Hudson's termination in December 2022 was over one year after her FMLA-approved leave. ECF

14

27-3, 27-10, 27-14 (Pl. Tr. Exs. 2, 9, 13). Certainly, temporal proximity between the protected leave and adverse action can be indirect evidence of a causal connection, but that is generally only when that temporal proximity is "acutely near in time." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (quotation omitted). While this is not a bright line test, a longer period of time between the events only makes the adverse action that much more attenuated. The sufficient attenuation in this case is further supported by the fact that <u>none</u> of Hudson's documented counseling, written warnings, PIP, or termination reference or rely on her FMLA-covered absences in any way. ECF 27-10, 27-12, 27-13, 27-14 (Pl. Tr. Exs. 9, 11, 12, 13).

Ultimately, Hudson is unable to satisfy the fourth element, and therefore cannot make out a *prima facie* case for retaliation to survive summary judgment.

## IV. CONCLUSION

For these reasons, this Court hereby **GRANTS** Defendant's motion for summary judgment.

    **IT IS SO ORDERED.**


Dated: April 14, 2025         */s/ Dan Aaron Polster*
                **Dan Aaron Polster**
                **United States District Judge**